<u>CONTINUATION IN SUPPORT OF CRIMINAL COMPLAINT & SEARCH WARRANT</u>

I, Justin D. Chamberlain, Special Agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being first duly sworn, on oath, hereby depose and state as follows:

*Introduction and Agent Background*

1. I make this affidavit in support of:

    a. a criminal complaint for Wolf Barrette **Harper** for the crimes of 18 U.S.C. 922(o) (unlawful transfer or possession of a machinegun) and 26 U.S.C. § 5845 (possession of a firearm required to be registered in the National Firearms Registration and Transfer Record); and

    b. a search warrant for **Harper's** residence, located at 1142 Dakin Street, Lansing, Michigan, 48912 ("**Target Residence**") for evidence, fruits, and instrumentalities of violations, or attempted violations, of 18 U.S.C. § 922(o) (unlawful transfer or possession of a machinegun), 18 U.S.C. § 922(a)(1)(A) (unlicensed dealing in firearms), and 26 U.S.C. § 5845 (possession of a firearm required to be registered in the National Firearms Registration and Transfer Record).

2. I am employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives and have served in this capacity since December 2013. Prior to being an ATF Special Agent, I was a Border Patrol Agent with the United States Border Patrol for nine years. During this role, I worked in three duty stations: (1) Deming, New Mexico; (2) Massena, New York; and (3) Ogdensburg, New York. I completed a training course at the Federal Law Enforcement Training Center, where I learned how to conduct complex investigations involving firearm trafficking. As part of my duties as an ATF Special Agent, I investigate criminal violations relating to federal firearms offenses. During my career, I have participated in numerous

firearms trafficking investigations, involving illegal manufacture and sale of handguns and machineguns. Additionally, my firearms trafficking investigations often result in execution of federal search warrants, seeking physical, and digital evidence identifying unlicensed individuals manufacturing and distributing firearms. As a result, I am familiar with how unlicensed manufacturers distribute firearms, to include firearms regulated by the National Firearms Act, and required to be registered in the National Firearms Registration and Transfer Record (NFRTR) to unlawful possessors and/or accomplices.

3. I currently work in conjunction with other federal, state, and local law enforcement agencies to investigate crimes involving firearms. These crimes are, often, violent in nature and revolve around the illegal use of firearms in furtherance of violent crime or drug trafficking. As such, I am a "federal law enforcement officer," within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for federal criminal offenses and make requests for warrants.

4. The facts in this affidavit come from my personal observations, training, experience, and information obtained from special agents, task force officers, police officers, detectives, and witnesses. This affidavit is intended to show that there is sufficient probable cause for the criminal complaint and does not set forth all information developed from the investigation.

*Summary*

5. In October of 2024, **Harper** sold 74 machinegun conversion devices, commonly referred to as "drop in auto-sears," one short-barreled rifle, and a silencer to an ATF undercover ("UC") agent. Agents have conducted surveillance at the **Target Residence**. In September 2024, **Harper** was seen outside the **Target Residence**. On two occasions in October of 2024, investigators saw **Harper** depart the **Target Residence**, in a vehicle registered to **Harper**, and meet with an ATF UC agent. During the encounters with the UC agent, **Harper** explained he can

manufacture as many drop-in auto sears as the agent can sell. **Harper** disassembled a silencer and explained how various silencers can be shortened or made longer for various applications. **Harper** demonstrated how to install a silencer on a short-barreled rifle. **Harper** told the UC agent he has made other machine gun conversion devices, also known as "Glock switches," and has ordered Glock switches to compare for functionality and quality.

## Probable Cause

6. In August of 2024, I spoke with a CS. The CS stated that he/she has known **Harper** for more than six months. The CS stated that **Harper** informed him/her that he manufacturers and sells firearms, silencers and auto sears. The CS stated that **Harper** told him/her that he regularly utilizes his 3D printer to manufacture parts and pieces to assemble firearms. According to the CS, during the summer of 2024, he/she was inside **Harper's** house and observed silencers and short barreled rifles. The CS described **Harper's** house as a single-family residence, located on 1142 Dakin Street, Lansing, MI, 48912.

7. The CS also informed ATF that he/she knows (541) XXX-6881 to be **Harper's** cellular telephone number (hereinafter, "**Harper's phone**"). The CS informed agents that he/she has spoken with a male voice on **Harper's phone** and recognizes the voice to be **Harper's** voice.

8. On August 30 of 2024, I queried Wolf Barrette **Harper** in the National Firearms Registration and Transfer Record (NFRTR). There were no records associated to **Harper**.

9. In September of 2024, ATF agents from the Lansing Field Office observed a blue, Ford F-150 (MI-XXX 1169). A license plate query revealed the vehicle was registered to Wolf Barrette **Harper**, 1142 Dakin Street, Lansing MI, 48912 (**Target Residence**).

10. In September of 2024, I observed a white male exit the **Target Residence**, and stand on the front porch for several minutes, I recognized the male, from a Michigan Secretary of State driver's license photograph, to be **Harper**.

11. In the first week of October 2024, agents and investigators from the Lansing Police Department observed **Harper** leave the **Target Residence** and drive his blue, Ford F-150 to a nearby commercial business in Lansing, where he sold an ATF agent, operating in an undercover (UC) capacity, (20) machine gun conversion devices, commonly referred to as "drop in auto sears," for $3,000.00 USD. **Harper** told the UC agent he manufactures the sears and can make as many as the agent orders. The agent ordered (50) additional auto-sears from **Harper** to be purchased at a later date. During the transaction the UC agent observed what appeared to be a firearm in **Harper's** waist band. After the transaction, investigators observed Harper drive his vehicle back to the **Target Residence**.

12. Days after the UC purchase of auto-sears, **Harper** contacted the agent on the Telegram app. **Harper** said he had the (50) auto-sears the agent had ordered previously, and can have more made, if the agent needed them. **Harper** said he had "some other things" to show the agent. **Harper** sent several photos of firearms he had manufactured. The agent asked if they were ghost guns (Privately Made Firearms (PMF)) and **Harper** replied, "They all are." Harper also included a picture of a silencer, and said he had modular cans (silencers) with boosters for 5.7- and 5.56-mm. **Harper** added, he has cans for pretty much any caliber of firearm. **Harper** said he 3D-prints the ghost guns and prints cans as well. The agent asked if anything was for sale and **Harper** replied, "everything is for sale depending on the right price." **Harper** said he had an AR9 and AR15 with silencers for sale. **Harper** said the silencer sell for $2,500.00 and the AR ghost guns are $5,000.00 but he would sell one of the ARs, with silencer for $6,000.00.

13. On October 21 of 2024, investigators observed Harper leave the **Target Residence** carrying a large, blue duffle bag. Harper got into his blue, Ford F-150 and drove to a predetermined location in Lansing where Harper met with an ATF agent operating in an undercover capacity. Harper was seen exiting his truck with the blue duffle bag and getting into the UC agent's vehicle. Harper sold the UC agent (54) auto-sears, a short-barreled rifle and a silencer for $8,000.00. Harper demonstrated how the silencer affixes to the short-barreled rifle. Harper said he shoots the silencer and that they are very quiet. Harper explained he manufactures other machine gun conversion devices, commonly referred to as "Glock switches," however they are not very good. Harper explained to the agent he orders parts from a "supplier" in China. Harper brought a second firearm, but the agent was unable to purchase the firearm.

14. I measured the short-barreled rifle purchased from Harper the previous day. The barrel, as measured from the end of the barrel (not including the threaded adapter for the silencer) to the breach measured 4" in length. The rifle had an overall length of 20 ½ inches. The firearm has a butt stock affixed to the rear of the firearm allowing the firearm to be fired from the shoulder mounted position. I believe this firearm meets the short-barreled rifle definition and, as such, is regulated by the National Firearms Act (NFA). I also determined that the majority of the parts from the purchased AR rifle were 3D printed and of polymer material. The amount of metal used in the manufacturing of the firearm was minimal and may not meet the requirement for a detectable firearm. I compared the devices purchased, by the undercover agent, from **Harper**, with similar devices seized by the ATF and determined to be auto-sears (machine guns). I found the devices to be similar in size, shape and material.

15. Each of the auto-sears that **Harper** sold to the UC is a part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a

weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. Each auto-sear, by itself, is also considered a firearm under federal law.

*Training & Experience*

16. Based on my training and experience, I know that individuals who possess firearms often possess other items commonly used or acquired in connection with the possession of firearms. Some of these items include, but are not limited to other firearms, firearm parts, ammunition, firearm receipts, firearms brochures or owner's manuals, records of sale or acquisition of firearms, firearms magazines, and holsters. Firearms manufacturers who manufacture undetectable (ghost guns/ PMF) acquire and use other items specific to the trade. Such items include 3D printers, reels of polymer plastic, laptops, computer hard drives, jump drives, thumb drives and various other media storage devices.

17. Firearms are durable and non-perishable goods, which can be expected to remain in the individual's possession for extended periods of time. Unlicensed firearms manufacturers, and dealers often sell their firearms to prohibited individuals who are unable to legally obtain a firearm by means of a licensed manufacturer or dealer. The manufacturer/ dealer relies on word of mouth from these street customers to build a customer list. Illegally manufactured firearms lack the required markings (serial numbers) enabling the firearms to be traced. These unmarked firearms, commonly referred to as "ghost guns" end up being used in violent crimes.

18. I know that individuals who engage in crimes, including illegal firearms manufacturing and trafficking, often use cell phones to facilitate or further their criminal activities, or maintain evidence of their criminal activities stored on their cell phones. Firearms traffickers commonly use cell phones to facilitate firearms transactions, maintain numbers for customers, suppliers, and/or associates, and store other information used in furtherance of their ongoing

firearms business. Firearms manufacturers commonly order parts, pieces, and track their orders through a variety of online sites.

19.  I also know that most individuals in contemporary America carry their cell phones on their person day and night, and cell phones, including "smartphones," play an integral role in the daily lives of individuals, including individuals engaging in many types of crimes.  For example, persons involved in illegal distribution of firearms commonly use their cell phones to communicate with each other (including sources of supply and customers) in a variety of ways to facilitate firearms transactions, including through the use of voice calls, text messages, voicemail messages, emails, social media messages, and/or other electronic means.

20.  Based on my training and experience, I know that a cell phone is a handheld wireless device used for voice and data communication through radio signals. Cell phones send signals through networks of transmitter/receivers, enabling communication with other cell phones or traditional "land line" telephones.  A cell phone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, cell phones offer a broad range of capabilities including: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cell phones may also include global positioning system ("GPS") technology for determining the location of the device.

21.  Based on my knowledge, training, and experience, I also know that electronic devices, including cell phones, can store information for long periods of time.  Similarly, things

that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the electronic devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence may be on the electronic devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the electronic devices seized pursuant to this warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

### *Conclusion*

25. Based upon the information above, there is probable cause to believe that Wolf Barrette **Harper** did knowingly possess, and transfer machine guns, in violation of 18 U.S.C. § 922(o) and that **Harper** possessed an unlicensed short-barreled rifle and/or silencer in violation of Title 26 U.S.C. § 5845.

26. There is also probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of 18 U.S.C. § 922(o), 18 U.S.C. § 922(a)(1)(A), and 26 U.S.C. § 5845 will be found at the **Target Residence**.